Paul F.X. RISTEEN, Plaintiff,

v.

YOUTH FOR UNDERSTANDING,
INC., and Youth for Understand-
ing USA, Inc., Defendants.

No. CIV.A.02–0709 (JBD).

United States District Court,
District of Columbia.

Sept. 12, 2002.

Alexander Nemiroff, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, MD, Alan Smith Kerxton, Rockville, MD, William John Hickey, Godwin & Hickey, LLC, Rockville, MD, for Youth for Understanding, Inc., defendant.

Joseph Edward Hartman, Fulbright & Jaworski, L.L.P, Washington, DC, for Youth for Understanding USA, Inc. dba Youth for Understanding International Exchange, defendant.

### MEMORANDUM OPINION

BATES, District Judge.

Before the Court is plaintiff Paul Risteen's motion seeking a preliminary injunction against defendants Youth for Understanding, Inc. ("YFU") and Youth for Understanding USA, Inc. ("YFU USA") to enjoin them from denying him continuation health insurance coverage under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 *et seq.*, as amended by the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.* Risteen, a former employee of YFU, alleges that YFU USA is the successor employer to YFU following YFU's corporate reorganization, and therefore that YFU USA must assume YFU's obligation to provide Risteen his remaining COBRA continuation health benefits. The Court is able to reach and decide the merits of Risteen's claims laid out in his motion for preliminary injunction and, upon consideration of plaintiff's motion, the submissions of the parties, and oral argument, the Court grants Risteen's motion.

### I. *Background*

Located in Washington, D.C., YFU was a non-profit corporation that specialized in high school student exchange programs matching American students with foreign

David Henderson Martin, Canfield, Smith & Martin, Washington, DC, Robert Scott Oswald, Employment Law Group, PLLC, Washington, DC, for Paul F.X. Risteen, plaintiff.

families and schools, as well as foreign students with American families and high schools. Complaint ¶ 4. Since 1951, more than 200,000 students have participated in YFU exchanges; in the 2001 academic year more than 3,000 students in the United States participated in YFU programs. YFU USA Opp., Ex. 1 at ¶ 3. Each participating country has its own national organization that coordinates the exchange of students; YFU served as the national organization in the United States. *Id.* at ¶ 4.

YFU hired Risteen as a Regional Director on December 12, 1994, and promoted him in January 1997 to Vice President for Programs, effectively the number two position in the YFU hierarchy just below the president. Complaint at ¶¶ 5–6. Risteen found the environment under McNally hostile and intolerable, and tendered his resignation in April 2001. *Id.* at ¶ 17. YFU's Board of Trustees met in late April 2001 and accepted Risteen's resignation. *Id.* at ¶¶ 22–23. However, the Board offered Risteen a contract as a temporary employee to work from home, paying Risteen the equivalent of six months of his former salary, and it bought out his benefits package. *Id.* at ¶ 24. In September 2001, the Board informed Risteen that they had decided not to continue his employment with YFU after the expiration of his contract. *Id.* at ¶ 28.

## A. Risteen's Action

Raising claims of employment discrimination, failure to pay wages, and ERISA violations, Risteen filed this action in the Superior Court of the District of Columbia on February 25, 2002, and YFU then removed the case to this Court. Notice of Removal ¶ 1. On March 8, 2002, Risteen found out from his pharmacy that YFU was no longer providing health insurance for him. Risteen Motion, Ex. 1 at ¶¶ 1–5. As a result, Risteen was left with $1,832 of unpaid medical expenses related to heart complications. *Id.* at ¶¶ 8–9. After repeated inquiries to YFU, he was told that all further communications must go through YFU's attorney. *Id.* at ¶ 13. On April 22, 2002, Risteen was hospitalized through an emergency room admission to George Washington University Hospital with a preliminary diagnosis of congestive heart failure and possibly a pulmonary embolism. *Id.* at ¶ 14. Because he no longer had health insurance, Risteen asked to be discharged on April 24, 2002—against his doctors' medical advice. *Id.* at ¶ 15. The medicine prescribed on his release cost $629 for a two-week supply, which, Risteen claims, he was instructed to take "for the rest of my life." *Id.* at ¶ 16. The cost of Risteen's hospital stay and medical tests exceeded $17,000. *Id.* at ¶ 17. Moreover, Risteen's urologist refused to perform necessary prostate surgery on Risteen until his heart and lungs could withstand anesthesia. *Id.* at ¶ 18. Risteen had follow-up appointments with his cardiologist, urologist, pulmonologist, and psychiatrist, each paid out of his own pocket. *Id.* at ¶ 19. Risteen claims that he is being denied (i.e., is denying himself) critical medial attention because he has no health insurance. *Id.* at ¶ 20.

## B. Motion to Amend the Complaint

■ Risteen has moved to amend his complaint to include two additional counts under COBRA. The proposed Count V of Risteen's amended complaint claims that YFU failed to pay benefits it owed Risteen before it ceased operations. Motion for Leave at pp. 5–7. Risteen maintains that YFU attempted to escape its COBRA liability to Risteen, and that YFU USA is "a mere continuation of the enterprise formerly known as YFU." *Id.* at p. 8. He contends that YFU has avoided its obligations under COBRA by "establishing a new corporate shell for the purpose of

receiving the benefits, assets, and goodwill of YFU, Inc., thereby liquidating the assets of YFU, Inc. and leaving it unable to pay for its lawful obligations." *Id.* at p. 6. Therefore, Risteen claims, pursuant to 29 U.S.C. § 1132(a), "[a]s a successor entity, YFU USA, is obliged under every theory of successor liability to assume the obligations of YFU, Inc., including its ERISA obligations." *Id.* at pp. 6–7. He seeks to recover the benefits for which he would have been eligible—approximately seven (7) months of COBRA continuation benefits—as well as his costs and attorney's fees. *See* Amended Complaint, at ¶ 44.

Under the proposed Count VI, Risteen seeks to add a claim for YFU USA's failure "to enroll Risteen into its health care plan, pursuant to COBRA, for the remainder of his eligibility period." *Id.* at ¶ 52. He maintains that YFU's "cessation of activities on March 8, 2002, and its subsequent transfer of its assets, employees, equipment, facilities, databases, clients, sponsors, and good will to Defendant YFU USA is a 'transaction to evade liability.'" *Id.* at ¶ 50. Risteen claims that "YFU USA is a mere continuation of the enterprise formerly known as YFU, Inc." Motion for Leave at p. 12.

Risteen may bring an action to recover and reinstate COBRA continuation benefits and allow for continuation health insurance coverage under 29 U.S.C. § 1132.[1] The statute states:

Civil enforcement: (a) Persons empowered to bring a civil action

A civil action may be brought—(1) by a participant or beneficiary—(A) for the relief provided for in subsection (c) of this section, or (B) *to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to fu-*

*ture benefits under the terms of the plan;* ... or (3) by a participant, beneficiary, or fiduciary (A) *to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan,* or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132 (emphasis added); *see also* 26 C.F.R. § 54.4980B–1, A–1(b) (beneficiaries may "file a lawsuit to redress the noncompliance"). As the Supreme Court stated In *Foman v. Davis,* "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Under Fed.R.Civ.P. 15(a), "[a] party may amend the party's pleading ... by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Court in *Foman* stated:

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

371 U.S. at 182, 83 S.Ct. 227. Here, Risteen moved to amend his complaint roughly five weeks after he learned that his health insurance benefits had been cut off—and hence without "undue delay" or "dilatory motive." Discovery had not yet begun, and there is no scheduling order in

---

1. *See, e.g., Gaskell v. Harvard Coop. Society,* 3 F.3d 495, 498 (1st Cir.1993); *Burgess v. Adams Tool & Engineering, Inc.,* 908 F.Supp. 473, 476 (W.D.Mich.1995).

place setting a discovery cutoff, a pretrial conference, or a trial date; thus there would be no prejudice to defendants if the amendment is permitted. Given that this action is in an early stage, and there are no allegations of bad faith or prejudice to the defendants, the Court grants Risteen's motion to amend his complaint.

## II. *The COBRA Framework*

ERISA, as amended by COBRA, requires that an "employer" who sponsors a group health insurance plan must offer employees and "qualified beneficiaries," including spouses and dependent children, the opportunity to continue their health insurance coverage, at group rates but at their own expense, for at least 18 months after the occurrence of a "qualifying event"—such as a layoff or termination. *See* 29 U.S.C. §§ 1161–1168. Congress enacted COBRA so that employees who lose their jobs through layoffs and terminations can purchase continuation health insurance at a rate approximately equal to the employer's group rate, which is normally far lower than the rate for individual coverage. *See Local 217, Hotel & Rest. Empl. Union v. MHM, Inc.*, 976 F.2d 805, 809 (2d Cir.1992). These employees thus may continue their health insurance through their former employer's group plans by paying no more than 102 percent of the monthly premium that the employer had paid. 29 U.S.C. § 1162(3)(A).

On January 10, 2001, the Internal Revenue Service ("IRS") promulgated final regulations to provide guidance on issues regarding COBRA continuation coverage. *See* 66 Fed.Reg. 1843 (Jan. 10, 2001); 26 C.F.R. § 54.4980B–1 through—10. The regulations specifically address who has the obligation to provide COBRA continuation health coverage following a business reorganization. *See* 26 C.F.R. § 54.4980B–9. The regulations relevant

here have not to date been the subject of judicial examination or application.

In determining responsibility for providing COBRA continuation coverage, these regulations define an "employer" as "[a] person for whom services are performed," as well as a "successor" to such a person. 26 C.F.R. § 54.4980B–2, A–2(a)(1)–(3). "An employer is a successor employer if it results from a consolidation, merger, or similar restructuring of the employer or if it is a mere continuation of the employer." *Id.* at A–2(b).

In certain circumstances, a successor employer resulting from a business reorganization will have "the obligation to make COBRA continuation coverage available to affected qualified beneficiaries." 26 C.F.R. § 54.4980B–9. Under the regulations, "[a] business reorganization is a stock sale or an asset sale." *Id.* at A–1(a). An "asset sale"—which is at issue here— "is a transfer of substantial assets, such as a plant or division or substantially all the assets of a trade or business." *Id.* at A–1(c). To determine the obligations of a "successor employer," the regulation states:

> In the case of an asset sale, if the selling group ceases to provide any group health plan to any employee in connection with the sale and if the buying group continues the business operations associated with the assets purchased from the selling group without interruption or substantial change, then the buying group is a successor employer to the selling group in connection with that asset sale.... If the buying group is a successor employer, a group health plan maintained by the buying group has the obligation to make COBRA continuation coverage available to M & A qualified beneficiaries with respect to that asset sale.

*Id.* at A–8(c)(1). At issue, therefore, is whether YFU USA is a successor employer to YFU following YFU's business reorganization and its asset sale to YFU USA, such that YFU USA is obligated to extend COBRA continuation coverage to "qualified beneficiaries" like Risteen.

### III. *YFU's Business Reorganization*

In 2000 and 2001, YFU was experiencing cash flow problems and facing insolvency. YFU Opp., Ex. 1 at ¶ 6. By October 2001, YFU had an overdraft of roughly $ 4 million on an American Express credit card used for student travel in 2001. *Id.* at ¶ 8. American Express instituted legal proceedings against YFU, and moved to attach a property in Washington owned by YFU known as the Rosedale Estate. *Id.* YFU also owed $3.5 million in secured bank debt, and over $2 million in unsecured debt to YFU international organizations. *Id.* These international YFU organizations examined alternatives to YFU's debt problems, including selling the Rosedale Estate, thought to be worth $10 million. *Id.*

At the time, several international YFU organizations discussed the possibility of "founding a new organization in the U.S. which would continue to support the 2001–02 students in the United States as well as place and support a possibly downscaled number of 2002–03 YFU students to the United States." *Id.* at ¶ 9. The primary objective of the new organization would be to "support a smaller group of 1,800 to 2,100 students for 2002–03." *Id.* at ¶ 10. Ulrich Zahlten, the president of YFU USA, explained:

> It was clear all along that this alternative would not be possible if the new organization were a total legal successor to YFU, Inc., assuming all its assets and liabilities, because then the new organization would *a priori* be in the same

situation of insolvency in which YFU, Inc. would be in creating this situation. *Id.* As a result, on January 31, 2002, the international YFU organizations from Japan, Germany, and Denmark created and incorporated YFU USA "to be prepared, in the event of YFU's insolvency, to care for and support the students currently in the program as well as those students selected and contracted for the 2002–2003 program." *Id.* It became apparent that YFU would become insolvent by February 28, 2002, but in order to resolve a number of outstanding issues, additional payroll funding was needed through March 8, 2002. *Id.* at ¶ 12. To obtain this funding, YFU sold its trademarks, copyrights, and logos to YFU International Educational Services, Inc., ("YFU IES"), an organization also recently incorporated to provide services to the international YFU network. *Id.* at ¶ 13. Although YFU IES owns these trademarks and logos, YFU USA has ¶ used them since it came into being, through an agreement with YFU IES. *See* Risteen Supp. Br., Ex. 2 at pp. 15–20; YFU USA Supp. Br., Ex. 3 at ¶ 5. YFU sold these rights to YFU IES for $314,000. YFU USA Supp. Br. at Ex. 1.

On March 7, 2002, three members were appointed to YFU USA's Board of Trustees, all with previous ties to the YFU organization. On March 8, 2002, YFU ceased operations, released its entire staff, and stopped offering health benefits. YFU Opp., Ex. 1 at ¶¶ 15–16. YFU USA took over for YFU at 5:00 p.m. on March 8, 2002, when YFU ceased operations. The next day, YFU USA rehired 77 of the approximately 100 former YFU employees, including the entire YFU field staff, at their same salaries. *Id.* at ¶ 15; Motion, Ex. 2 (email from Jordan to Koepplinger dated April 30, 2002). These employees continue to work in their former offices at the Rosedale Estate (a building that YFU still owns). *See* Motion, Ex. 4 at ¶ 4; YFU

Opp., Ex. 1 at ¶ 19 ("YFU USA has offices in the building owned by YFU").

### III. *The Assets "Transferred"*

Under the regulations, "[a]n asset sale is a transfer of *substantial assets,* such as a plant or a division or substantially all the assets of a trade or business." 26 C.F.R. § 54.4980B–9, A–1(c) (emphasis added). The Court must determine, therefore, whether, as a result of this business reorganization, there was "a transfer of substantial assets" from YFU to YFU USA. Upon careful analysis of the various assets involved—individually and as a whole—the Court finds that YFU transferred "substantial assets."

### A. Databases and Other Marketing/Training/Operational Materials

On March 26, 2002, YFU sold to YFU USA six databases containing names, information, and key data for managing the organization.[2] The databases included (a) the Student–Incoming Database, with each incoming student's data used to manage student progress; (b) the School Database, which contains information on participating schools and the quality of their programs; (c) the Host–Family Database, which stores information on who has hosted students in the past; (d) the Alumni Database of former participants who are key to fundraising campaigns; (e) the Donor Database, which stores information on all individuals or corporations who have donated in the past and thus serves as a major source of revenue for the non-profit organization; and (f) the Student Support Database, which is maintained for the U.S. Department of State and contains all volunteer and staff contacts with host families

and students. *See* Risteen Supp. Br., Exs. 4–6; *see also* YFU USA Supp. Br., Ex. 2 at p. 1.

Along with the databases, YFU sold certain intellectual property—including marketing and promotional materials, training materials and handbooks, an inventory of other publications, software, and YFU's website and domain name—to YFU USA in the agreement that was signed on March 26, 2002. *See* YFU USA Supp. Br., Ex. 2. These assets were first used shortly after 5:00 p.m., March 8, 2002, through permission of YFU until a formal agreement could be worked out. USA Supp. Br., Ex. 2 at ¶ 3. No sales price for these items has yet been determined.

### B. Rosedale Estate and Office Equipment

YFU did not sell Rosedale Estate, which is reportedly worth $10 million, to YFU USA. However, YFU USA is working out of the YFU's offices, and most of YFU's former employees continue to report to their offices at the Rosedale Estate. YFU Opp., Ex. 1 at ¶ 18. Before YFU sells Rosedale Estate, YFU USA will obtain other office space to rent. *Id.* at ¶ 19. Furthermore, YFU USA is also using YFU's office equipment, computers, copy machines, furniture, and phone system. *See* Motion, Ex. 5 at p. 2; YFU Opp., Ex. 1 at ¶ 19. YFU USA states that this equipment is being used "under a hosting agreement with YFU," although that agreement still had not been finalized more than two months after YFU ceased operations. YFU Opp., Ex. 1 at ¶ 19.

### C. Trademarks, Logos, and Company Name

In a sales agreement finalized on March 26, 2002, YFU sold its trademarks, corpo-

---

**2.** This "sale" was for an amount to be determined, with the assistance of an outside party, by June 30, 2002. YFU USA Supp. Br., Ex. 2 at ¶ 3. As of this date, the sale amount still apparently has not been determined.

rate and company names, and logos to YFU IES for $314,000. YFU USA Supp. Br., Ex. 1. Before the sale was finalized, however, YFU IES permitted YFU USA to use these assets through an understanding that a licensing agreement would be reached; that use has continued since March 11, 2002. *See* Risteen Supp. Br., Ex. 2 at pp. 17–20; YFU USA Opp., Ex. 1 at ¶ 13. The Court has not been informed that a licensing agreement has yet been reached. Grooms–Cowal, the former YFU president, pointed out that "a company like YFU, Inc. relies heavily on its trademarks and name recognition in order to generate business," and YFU's "trademarks are of particularly high value, that value having been built over the 50 years since its founding." Risteen Supp. Br., Ex. 5 at ¶ 13.

### D. Same Employees

The fact that most of YFU's employees were rehired at their same positions by YFU USA also supports the conclusion that YFU USA is a successor employer to YFU. YFU USA rehired 77 of the approximately 100 former YFU employees, in their former positions, including the entire YFU field staff of 50 employees. *See* YFU Opp., Ex. 1 at ¶ 15. For example, YFU's human resources director, Jim Teleford, was rehired by YFU USA to do the same job he performed at YFU. *See* Motion, Ex. 4 at ¶ 3; Risteen Supp. Br., Ex. 7. Moreover, Margaret Uelner Ott, who was the Director of Contracts for YFU, was rehired by YFU USA as the Director of Programs and Contracts. YFU USA's Supp. Br., Ex. 3 at ¶¶ 1–2. In an e-mail exchange, a former YFU employee who was rehired by YFU USA told a former YFU employee that "so far, we were all rehired with the new company at the same salaries." Motion, Ex. 2 (e-mail from Jordan to Koepplinger dated April 30, 2002).

### E. The Volunteer Network

It is also noteworthy that YFU provided YFU USA with its lists and data on volunteers. *See, e.g.,* Motion, Ex. 3 at ¶ 1; Motion, Ex. 5. Grooms–Cowal emphasized the importance of YFU's database of its volunteers, which contains information on between 4,000 and 12,000 volunteers. Motion, Ex. 5; Risteen Supp. Br., Ex. 5 at ¶¶ 3–6. Without the database and lists of volunteers, "the company: a) would not be able to communicate with this essential workforce; b) would be required to recruit an equivalent workforce of thousands of volunteers or hire paid staff to work in lieu of volunteers; and c) would be critically impeded in operating its business." Risteen Supp. Br. at ¶ 6.

### IV. *Analysis*

■ The Court finds that the sale, transfer, and use of these assets—the databases, trademarks, office equipment and furniture, volunteer network, website and domain name, company goodwill and the use of Rosedale Estate—constitutes a "transfer of substantial assets" under the new COBRA regulations.

Three former officers with direct knowledge of YFU's operations have submitted affidavits asserting that YFU USA could not operate without the databases and other assets transferred from YFU. Former ambassador Sally Grooms–Cowal, who was the president and chief executive officer of YFU from 1999 through 2001, stated that without YFU's Student–Incoming Database, YFU USA "would be unable to operate its business due to lack of information regarding the students for which it is responsible." *Id.* at ¶ 7. She described the Alumni Database as "vital to the YFU business model," and stated that the "Student Support Database" contained "critical information . . . because exchange organi-

zations require State Department approval to remain in business." *Id.* at ¶¶ 10–12. YFU USA could not operate, she has stated, without these assets transferred from YFU:

> These assets, individually and in combination, are critical to implementing the volunteer-based business model of YFU; *without them it would be impossible to operate without investing extensive capital and time in developing them.* A company desiring to enter the field of international student exchange and to effectively compete and provide service to 1,500 students or more, *could not operate without each, and all, of these assets.*

*Id.* at ¶¶ 14–15 (emphasis added).

Similarly, both Alex Plinio, who is currently the president of a large international student exchange organization comparable to YFU, and Peter Engebretson, a former vice president, executive vice president, and interim president of YFU, agree with Grooms–Cowal's statements. *See* Risteen Supp. Br., Exs. 4–6. Plinio reiterated Grooms–Cowal's assertion that an international exchange organization could not operate without these assets:

> The importance of these assets to an organization like YFU, Inc. are essential. In fact, to reconstruct or rebuild such databases, or to develop the same reputation, a company would have to expend great resources and capital, which could take years to realize. A company desiring to enter into the field of international student exchange and to effectively complete or provide services to 2500 students or more, *could not operate without each of these items.*

Risteen Supp. Br., Ex. 4 at ¶¶ 15–16 (emphasis added). Engebretson reiterated the same points: these assets "are critical to implementing the volunteer-based business model of YFU," and without them, "it

would be impossible to operate without investing extensive capital and time in developing them." *Id.,* Ex. 6 at ¶ 14. In short, Engebretson concluded, a company like YFU "could not operate without each, and all, of these assets." *Id.* at ¶ 15.

This evidence is particularly helpful and deserving of credence. The fact that these individuals agreed that YFU USA could not operate without receiving these assets from YFU underscores the importance and value of the assets. These officers—who have no stake in the outcome of this case—have been either high officials at YFU with a deep understanding of the business, or work for another student exchange organization that is comparable to YFU. In fact, even the president of YFU USA, Ulrich Zahlten, recognizes the importance of these databases: "[i]t is clear that the acquisition of these items, especially the data bases, is necessary if YFU USA is to be successful in continuing to support students, host families and volunteers, rather than leave them stranded when YFU, Inc. failed to meet its payroll." YFU Opp., Ex. 1 at ¶ 25. If YFU USA could not operate its student exchange business without these databases, then it would seem they are "substantial" assets.

YFU USA argues that because YFU did not sell to YFU USA its most valuable asset, the Rosedale Estate, there was not a transfer of "substantially all the assets." However, there is more than one way of valuing an asset. A building may be a "substantial asset" to a company, for example, if that building is a plant, factory, warehouse, gas station, or restaurant—businesses highly dependent on the particular building or site. YFU's former interim president and former executive vice president, Peter Engebretson, stated that "YFU could operate from virtually any physical plant or location." Risteen Supp. Br., Ex. 6 at ¶ 16. More importantly,

however, the regulation only requires a transfer of "substantial assets"—the term "substantially all the assets" is simply illustrative of what might constitute an of example of a transfer of "substantial assets."

YFU USA has been working out of YFU's offices at the Rosedale Estate since the reorganization, and the YFU employees who were rehired by YFU USA (almost 80% of the workforce) continue to report to those same offices. Although YFU USA did not buy the Rosedale Estate, YFU is still allowing YFU USA to use the offices at the Rosedale Estate, without paying rent, while YFU USA looks for additional space to rent elsewhere. That is, in a way, a transfer of the right to use this space. The IRS has noted that an "asset sale includes not only sales but other transfers as well." 66 Fed.Reg. at 1846.

YFU USA also claims that it "did not *acquire* any equipment, real property or other tangible assets from YFU." YFU Opp., Ex. 1 at ¶ 19 (emphasis added). But even though YFU USA did not buy equipment from YFU, the use of the equipment nonetheless has been transferred— through a "hosting agreement"—to YFU USA. In fact, YFU USA concedes that it may elect to purchase this equipment. *Id.* Nonetheless, whether this equipment and furniture was "acquired" is not determinative because asset sales under the regulations include "other transfers as well."

The fact that YFU sold its trademarks, corporate names, and logos to YFU IES— and not directly to YFU USA—also does not mean that those assets were not transferred to YFU USA. After all, YFU USA has the full right to use, and has been using, these trademarks and logos through an agreement with YFU IES. *Id.* And clearly these assets are valuable (having been sold for $314,000) and thus arguably "substantial." Again, under the regula-

tions the touchstone is not whether these assets were "sold" to YFU USA, since asset sales include other transfers as well as sales. In the end, even though there was no "sale," YFU USA still ended up with the use of these assets from YFU, albeit through YFU IES.

Furthermore, although there was a concrete valuation for the trademark rights, there was no valuation for the goodwill YFU built up over the past 50 years in the student exchange business. When students, parents, teachers, and donors hear about YFU USA, they may well associate it with YFU. Thus, YFU USA benefits from YFU's goodwill established over 50 years. That is an important intangible asset, partially reflected in the trademarks, given the reputation and name that YFU built as a leader in the field of student exchange programs. YFU's goodwill must therefore be considered as part of the overall transfer of assets from YFU to YFU USA.

Finally, the COBRA regulations explain that if the employer who purchased the assets hires most of the same employees to work in their same jobs and continues the business operations, that employer is a "successor employer":

> Selling Group S provides group health plan coverage to employees at each of its operating divisions. S sells substantially all of the assets of all of its divisions to Buying Group P. *P hires most of S's employees on the date of the purchase of S's assets, retains those employees in the same positions that they had with S before the purchase,* and continues the business operations of those divisions without substantial change or interruption. . . . [B]ecause P continued the business operations associated with those assets without substantial change or interruption, P is a

successor employer to S with respect to the asset sale.

26 C.F.R. § 54.4980B–9, Example 8(i)-(ii) (emphasis added). Hence, the fact that YFU USA rehired 77 of 100 former YFU employees—at the similar positions and same salaries—is additional evidence that YFU USA is the "successor employer" to YFU. *Id.*

As the comments to the regulations state, "[t]his definition [of asset sale] is intended to be flexible enough to apply reasonably to the myriad situations in which this issue arises," and "[t]he application of this rule in any particular case depends on all the relevant facts and circumstances." 66 Fed.Reg. at 1846. Under this "flexible" standard, the Court must consider the fact that YFU USA is a non-profit service organization, in which context the databases of information and volunteer network are critical. Particularly for a small, non-profit organization like YFU USA, a database of past contributors and donors is vitally important for access to the names of former donors for raising funds to help sustain the organization. Similarly, YFU's network of volunteers is a critical workforce for a non-profit organization on a limited budget. Furthermore, with YFU's 50 years of experience, the importance of its name and reputation for leadership in the field makes its trademarks and goodwill indispensable.

The fact that YFU did not transfer the $10 million Rosedale Estate does not change this analysis, because that fact does not mean that YFU did not transfer or sell other "substantial assets" to YFU USA. That property, although perhaps more valuable in terms of dollars, is not necessarily the most important asset needed for running this particular business. YFU USA could effectively operate out of any office space. YFU USA, however, would have a very difficult time operating without the databases and other materials YFU sold to YFU USA, or without the former YFU employees it hired. Thus, under the regulation's "flexible" standard, the conclusion that substantial assets have been transferred to YFU USA is not changed by the fact that the Rosedale Estate was not also transferred.

## V. *Continuing the Business Operations*

■ For a successor employer to be required to assume the COBRA obligations of the former employer, the successor employer must "continue[ ] the business operations associated with the assets purchased from the selling group without interruption or substantial change." 26 C.F.R. § 54.4980B–9, A–8(c)(1). Here, there is little doubt that YFU USA is "doing precisely the same work that [YFU] had been doing for the past fifty years." Motion, Ex. 3 at ¶ 1. YFU USA's own literature states that it is virtually the same organization as YFU and continues the business operations associated with the assets—only the corporate structure has changed. Just days after YFU ceased operations, Mary Alvey, a YFU USA district director, sent a letter to former YFU volunteers informing them of the corporate reorganization:

> You may have heard that Youth For Understanding, Incorporated, has ceased to exist and perhaps you have been worried about where that leaves you and the students and families you represent. There is a kernel of truth in that statement, but it doesn't tell you enough. Youth for Understanding did cease to exist as a corporation on Friday, March 8, 2002.
>
> Youth for Understanding, USA, was incorporated before then and this new organization (while distinct from YFU, Inc.) began to operate immediately. The mission is unchanged. The Field

Staff remains the same. The students continue, just as before. They will leave on time, and their tickets still exist. The Host Families will continue to care for their students as they have in the past. Student insurance continues, unchanged. *YFU USA will operate with you, with the students, host families, and schools just like YFU, Inc. did in the past.* Staff are available to you an the same phone numbers, the same e-mail addresses in the past.

Risteen Motion, Ex. 5 (emphasis added). A newsletter in April 2002 also underscored that the change from YFU to YFU USA was largely in corporate structure:

Youth for Understanding USA, Inc. is alive and well. It began doing business on Saturday, March 9, 2002. It is working with our YFU partners and the present and future students, families, volunteers, and staff who transitioned into YFU USA.... Most of the change is corporate, and will not effect you. District staffs are intact, and will be available to work with you as they always have.

*Id.*

YFU USA continues to honor some of the vendor contracts that YFU used because it wanted to continue to work with those same vendors. YFU Opp., Ex. 1 at ¶ 20. It has also accepted close to $100,000 in corporate funds and donations—after donors were informed of the organizational change—that were originally intended for YFU. *Id.* at ¶ 21. Even YFU USA's Board of Trustees are from the YFU organization. Mary Coffey, a YFU USA director, sent out a letter to volunteers stating that the "new Board of Trustees consists of a small crew of people who have a long history with YFU." Motion, Ex. 5 (letter from Coffey dated March 25, 2002).

Finally, there was no interruption of the business when YFU sold its assets to YFU USA. As the regulation states, "if the buying group continues the business operations ... without interruption or substantial change, then the buying group is the successor employer." 26 C.F.R. § 54.4980B–9, A–8(c)(1). YFU USA is essentially running the same business that YFU did, although with a somewhat smaller staff, and hence YFU USA is continuing the business operations that are associated with the assets and is a "successor employer" to YFU.

## VI. *Supporting Case Law*

Given that no other courts have had an opportunity to apply the IRS COBRA regulations, it is useful to consider the case law discussing "asset sale" cited in the IRS's summary of the regulations. The summary states:

**Business Reorganizations:** ... The asset sale rules, including the definition of asset sale, are similar to the various formulations of successor employer rules that have been fashioned by the courts for various labor law purposes, adapted to the peculiar circumstances that the COBRA continuation coverage requirements create. In those cases, as in the final rule, a case-by-case approach is favored. *See, e.g., Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir.1974);

*In re National Airlines, Inc.,* 700 F.2d 695 (11th Cir.1983); *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323 (7th Cir.1990); *Central States, Southeast & Southwest Areas Pension Fund v. PYA/Monarch of Texas, Inc.,* 851 F.2d 780 (5th Cir.1988).

66 Fed.Reg. at 1846.

The conclusion that YFU USA is a "successor employer" to YFU is reinforced by this body of law. For example, in *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), the Supreme Court stated:

> [We have] approved the approach taken by the Board and accepted by courts with respect to determining whether a new company was indeed the successor to the old. This approach, which is primarily factual in nature and is based upon the totality of the circumstances of a given situation, requires that the Board focus on whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." Hence, the focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

482 U.S. at 43 (citations omitted). All the factors noted in *Fall River* are present in YFU's business reorganization. The business of YFU and YFU USA is essentially the same; the production process has not

changed and, indeed, YFU USA is still providing the "same product"; and YFU USA certainly still has the "same body of customers"—students and families interested in student exchange and study abroad.

Moreover, most of the former employees of YFU are doing the same jobs in the same working conditions, which is further evidence that YFU USA is a successor employer. *See Fall River,* 482 U.S. at 43, 107 S.Ct. 2225; *see also Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 263, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) ("This continuity of identity in the business enterprise necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership.... [M]ost of the lower courts have placed [emphasis] on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the successor."); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) ("[s]uccessorship has been found where the new employer purchases a part or all of the assets of the predecessor employer"); *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 279, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (noting the obligations of a successor employer "if a majority of employees after the change of ownership or management were employed by the preceding employer").

There was no hiatus between the end of YFU and the start up of YFU USA—another factor noted in *Fall River* as evidence of "substantial continuity." *See* 482 U.S. at 45, 107 S.Ct. 2225; *see also Upholsterers' Int'l Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1326 (7th Cir.1990) (employer who "substantially assumes a predecessor's assets [and] continues the operations without interrup-

tion or substantial change" assumes liabilities of predecessor). YFU ceased operations at 5:00 p.m. on Friday, March 8, 2002 and YFU USA started at that same moment—a seamless transition between the two organizations. Indeed, shortly after the reorganization, YFU USA informed YFU's employees and volunteers that the reorganization was simply a corporate change: "Most of the change is corporate, and will not effect you." Risteen Motion, Ex. 5 (letter from Alvey dated April 2002). A YFU USA letter to volunteers stated:

> The mission is unchanged. The Field Staff remains the same.... The Host Families will continue to care for their students as they have in the past.... YFU USA will operate with you, with the students, host families, and schools just like YFU, Inc. did in the past.

Risteen Motion, Ex. 5 (letter to YFU volunteers from Alvey dated March 11, 2002). Finally, the fact that YFU USA is still working out of YFU's Rosedale Estate and still using YFU's office equipment, computers, and furniture also suggests that it is the successor employer to YFU. *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir.1974) (factors for successorship include "whether the new employer uses the same plant" and "whether he uses the same machinery, equipment and methods of production").

Simply put, the case law cited in the regulations strongly supports the conclusion that YFU transferred substantial assets to YFU USA, and that YFU USA is therefore the successor employer to YFU. As a successor employer under the regulations, YFU USA is responsible for the COBRA obligations of its predecessor.

## VII. *YFU USA's Health Plan*

■ YFU USA contends that because it did not have a health plan in place at the time of the asset sale on March 8, 2002, it is not liable, under the language of the regulations, for Risteen's COBRA continuation coverage. The regulation states:

> A group health plan of the buying group has [the obligation to make COBRA continuation coverage available] beginning on the later of the following two dates and continuing as long as the buying group continues to maintain a group health plan ...—(i) The date the selling group ceases to provide any group health plan to any employee; or (ii) The date of the asset sale.

26 C.F.R. § 54.4980B–9, A–8(c)(1). When YFU ceased operations on March 8, 2002, it also ended its health plan. YFU USA Supp. Br., Ex. 4 at ¶ 3. YFU USA's health plan, however, did not go into effect until May 1, 2002—seven weeks after YFU ceased operations and transferred assets to YFU USA. *See id.* at ¶ 10. YFU USA contends that by its language the regulation only obligates a buying group to provide COBRA continuation coverage "as long as the buying group continues to maintain a group health plan," and that if there is no health plan—as was the case for seven weeks—there is no obligation to provide COBRA continuation coverage.

YFU USA quotes the applicable regulatory language—"as long as the buying group continues to maintain a group health plan"—out of context. The language actually pertains to *how long* the buyer must provide insurance. In other words, on the date a buying group *stops* providing a group health plan for its own employees, its obligation to provide COBRA continuation coverage to the selling group's former employees would end as well.

The regulation does speak as well of a buying group maintaining a health plan: "If the buying group is a successor employer, *a group health plan maintained by the buying group* has the obligation to make COBRA continuation coverage avail-

able ...." 26 C.F.R. § 54.4980B–9, A–8(c)(1) (emphasis added). The Court finds that YFU USA has "maintained" (*i.e.*, provided) a group health plan, and thus YFU USA must provide COBRA continuation benefits to Risteen.

The fact that there was a seven-week gap between the sale of the assets (or start of YFU USA's operations) and the date YFU USA's group health plan became effective does not alter that conclusion. Employees were told to buy their own temporary insurance until YFU USA could set up a health plan. Risteen Supp. Br., Ex. 7 at pp. 57–58. Teleford, YFU USA's human resources director, sent out a series of e-mails to employees beginning on March 25, 2002, instructing employees that YFU USA "wants to help you with your temporary insurance that you have obtained on your own." Risteen Supp. Br., Ex. 7 at p. 58; Pl.'s Reply, Ex. 5. The e-mail stated that "[w]e will formulate a plan for reimbursing you for the costs you have incurred." *Id.* This decision by YFU USA to reimburse employees for their health insurance just two weeks after YFU USA began operations reinforces the conclusion that YFU USA "maintained" a health plan.

Thus, under the regulations, YFU USA's obligation to provide COBRA continuation coverage to a former YFU employee like Risteen would typically begin on the date of the asset sale (March 8, 2002, or later), or on the date that YFU ceased to provide any group health plan to any employee (March 8, 2002), whichever is later. *See* 26 C.F.R. § 54.4980B–9, A–8(c)(1)(i) and (ii). However, YFU USA did not have an actual group health insurance plan in place until May 1, 2002, and per-

haps it should be from that date that YFU USA must provide Risteen with his remaining COBRA continuation coverage. Moreover, there is some uncertainty as to when precisely the "asset sale" occurred. In any event, the COBRA continuation coverage obligation will run until YFU USA ceases to provide a group health plan to its employees, or until Risteen's COBRA continuation coverage eligibility ends, whichever is first. *See* 26 C.F.R. § 54.4980B–9, A–8(c)(1). Given the uncertainty as to the proper commencement date for YFU USA's obligation for Risteen's COBRA continuation coverage (and as to Risteen's current health insurance status), the Court will require the parties to submit a proposed order implementing this decision. Of course, YFU (or its group health plan) presumably was responsible for Risteen's covered medical expenses incurred prior to March 8, 2002, when YFU ceased operations, because such coverage was part of YFU's COBRA continuation coverage obligations before it ceased operations and terminated any group health plan for its employees.[3]

## VIII. *Preliminary Injunction Standards*

In order to prevail on his motion for preliminary injunctive relief, plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) that he will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Taylor v. Resolution Trust Corp.*, 56 F.3d

---

**3.** There is no doubt that Risteen is a "qualified beneficiary" under these regulations, and the parties do not dispute this. The regulations define a qualified beneficiary as an individual who is a "covered employee whose last employment prior to the qualifying event was

associated with the assets being sold." Risteen's resignation became effective in late April 2001, *see* Compl. at ¶ 22, and his COBRA continuation benefits began from that point; YFU was responsible for those benefits from April 2001 through March 8, 2002.

1497, 1505–06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977). In determining whether to grant urgent relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.*

██ It is particularly important for a plaintiff to demonstrate a substantial likelihood of success on the merits. *Morgan Stanley DW Inc. v. Rothe*, 150 F.Supp.2d 67, 73 (D.D.C.2001). Where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Brotherhood of Teamsters, AFL–CIO*, 166 F.3d 356, 367 (D.C.Cir.1999). Here, as explained in detail above, Risteen has demonstrated an overwhelming likelihood of success on the merits of his claim that YFU USA must provide him continuation COBRA benefits.

Moreover, Risteen has shown that, absent relief, he will suffer irreparable harm. He is already foregoing critical medical attention because he has lost his health insurance. He remains unemployed, has no other income, and, besides his home and car, has no other assets of significant value. The loss of health insurance benefits—particularly for those who are unemployed—constitutes irreparable harm for purposes of a preliminary injunction.[4]

At the same time, requiring YFU USA to provide continuation coverage would have less of an impact on YFU USA. Under COBRA, YFU USA is only obligated to allow Risteen to *participate* in its group health plan. Risteen must pay the premiums each month. In fact, Risteen has already exhausted roughly 11 months of his COBRA benefits, and has only roughly seven months of benefits remaining. Fulfilling a legal obligation to provide COBRA continuation benefits over such a period is hardly irreparable harm.[5]

---

4. *See, e.g., Communications Workers of America, District 1, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir.1990) (the threat of termination of medical benefits to striking workers constitutes irreparable harm); *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 8 & 9 (1st Cir.1987) (loss of insurance benefits to retired workers constitutes irreparable harm); *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir.1979) ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury"); *Cabral v. Olsten Corp.*, 843 F.Supp. 701, 703 (M.D.Fla.1994) (in a COBRA case, threat of termination of health insurance benefits for uninsured breast cancer patient constituted irreparable harm); *Hinckley v. Kelsey–Hayes Co.*, 866 F.Supp. 1034, 1045 (E.D.Mich.1994) (retirees established irreparable harm if the court did not order reinstatement of health insurance benefits); *U.A.W. v. Exide Corp.*, 688 F.Supp. 174, 186–

87 (E.D.Pa.), *aff'd mem.*, 857 F.2d 1464 (3d Cir.1988); *Howe v. Varity Corp.*, 1989 WL 95595, * 13 (S.D.Iowa) ("As a matter of law, the termination of health insurance benefits, particularly to those on a fixed income, constitutes a threat of irreparable harm sufficient to warrant a preliminary injunction"); *Johnson v. Plainville Casting Co.*, 1988 WL 167346, * 2 (D.Conn.1988) ("It is well-settled that the termination of health insurance benefits presents a threat of irreparable harm sufficient to support temporary equitable relief.").

5. YFU USA's Director of Human Resources, James Teleford, maintains that he contacted The Guardian, YFU USA's health provider, to inquire about coverage for former employees of YFU. He states that Guardian "would not cover any former YFU employee who had not been an employee of YFU USA." YFU USA Supp. Br., Ex. 4 at ¶ 13. YFU USA's health plan was rated and priced by Guardian on the

Finally, the public interest is served here by requiring YFU USA to provide Risteen continuation health coverage. The underlying purpose of COBRA is to ensure that employees who lose their jobs still receive limited health insurance benefits, and an injunction would further that legislative goal. *See Phillips v. Saratoga Harness Racing, Inc.*, 240 F.3d 174, 179 (2nd Cir.2001) ("COBRA was enacted as a legislative response to the growing number of Americans without health insurance and the reluctance of hospitals to treat the uninsured."); *National Cos. Health Ben. Plan v. St. Joseph's Hosp., Inc.*, 929 F.2d 1558, 1569–70 (11th Cir.1991) ("the goal of COBRA ... is to provide continuation coverage until group plan participants are able to obtain other coverage"). An injunction is consistent with the legislative purpose of COBRA, and thus serves the public interest. *See, e.g., Comcast SCH Holdings, Inc. v. Villages of Lake–Sumter, Inc.*, 168 F.Supp.2d 1338, 1351 (M.D.Fla. 2001) (injunction consistent with purpose of statute is in the public interest).

### CONCLUSION

Accordingly, for these reasons, the Court grants plaintiff Risteen's motion for a preliminary injunction. The Court concludes that YFU USA is—under the IRS COBRA regulations—a successor employer to YFU. As such, YFU USA has the obligation to provide Risteen COBRA continuation health benefits. However, given the unique circumstances of this case, the Court will require the parties to discuss

when YFU USA's obligation to provide COBRA continuation coverage should commence, and to submit a proposed order, or separate proposed orders if necessary, by no later than September 20, 2002. A separate order will be issued.

---

basis of the employee census provided by YFU USA. *Id.* Additions to YFU USA's health plan are therefore "permitted under certain restricted circumstances, like a new hire." *Id.*

This does not alter the Court's analysis. The COBRA regulations make no allowance for the financial ability of a successor employer or its insurance plan to assume the continued coverage of a former employee. In fact, the regulations *anticipate* the former employ-

ees of the predecessor company who were not hired by the successor company would be covered under that successor employer's health plan. *See, e.g.,* 26 C.F.R. § 54.4980B9, Example 5(ii); Example 6(iii); Example 8(ii). Guardian is only purportedly unable to add Risteen because YFU USA did not initially include him on the original census of employees to be covered by Guardian.